1

**DAVIS, COWELL & BOWE, LLP**
JOHN J. DAVIS, JR., SBN 65594, *jjdavis@dcbsf.com*

2

ERIC B. MYERS, SBN 223125, *ebm@dcbsf.com*

3

DAVID L. BARBER, SBN 294450, *dbarber@dcbsf.com*
595 Market Street, Suite 1400

4

San Francisco, CA 94105

5

Tel**:** (415) 597-7200
Fax**:** (415) 597-7201

6

7

Attorneys for *Qui Tam* Plaintiffs and Relators Bill Haley, Harry Rotz, and Lew Long

8

**UNITED STATES DISTRICT COURT**

9

**NORTHERN DISTRICT OF CALIFORNIA**

10

11

12

EAST BAY MUNICIPAL UTILITY DISTRICT;     ) Case No. 13-cv-02032-WHO
SACRAMENTO COUNTY WATER AGENCY;          )

13

FREEPORT REGIONAL WATER AUTHORITY;       )
CITY OF SACRAMENTO; CITY OF              )

14

ROSEVILLE; and CITY OF RIO VISTA,        )     **FIRST AMENDED COMPLAINT**

15

)

16

    *ex rel.* BILL HALEY; HARRY ROTZ;    )     [False Claims Act]
      and LEW LONG,                  )     [Government Code §§ 12650, *et seq.*]

17

)

18

    Plaintiffs,                       )     Original Complaint Filed: October 26, 2012

19

  v.                                    )     Removed: May 2, 2013

20

)     FAC Filed: January 21, 2013
BALFOUR BEATTY INFRASTRUCTURE, INC.;     )

21

CRANDALL BATES; REGINALD B.              )
CHAMBERLAIN; C. WILLIAM CLARK; BRIAN     )

22

MILLER; TRAVIS PRICE; CHRIS              )
RUTHERFORD; and DOES 7 through 100,      )

23

)

24

    Defendants.                       )
                    /

25

26

27

28

**INTRODUCTION**

This is a *qui tam* action to recover damages and civil penalties arising from false claims, statements and records that Defendants have made in violation of the California False Claims Act, Government Code §§ 12650 *et seq.* ("FCA").  The FCA permits the recovery of treble damages and civil penalties from any person who presents a false claim for payment to the State of California or one of its political subdivisions, and does so with actual knowledge, deliberate ignorance or reckless disregard of the claim's falsity.  Under the FCA, a contractor certifies compliance with the provisions of a public-works contract when it bills a public entity for goods or services provided under that contract.

Over the last ten years, Defendant Balfour Beatty Infrastructure, Inc. ("Balfour Beatty" or "Defendant"), a construction contractor, has performed public-works construction projects for various public entities in California.  Each project was undertaken pursuant to a public-works contract between Balfour Beatty and one or more public entities that expressly obligated Balfour Beatty to comply with California's prevailing wage law and to employ and train apprentices as required by that law.  Labor Code § 1777.5 requires contractors on public works projects to employ and train minimum numbers of apprentices, and do so in accordance with their written apprenticeship standards.  These written apprenticeship standards, approved by the State of California, outline the specific work processes in which apprentices are required to be trained and employed.

Defendant consistently failed to comply with its public-works contracts by failing to employ and train apprentices as required by Labor Code § 1777.5 and related regulations.  Balfour Beatty performed complex pipefitting work on the projects but did not employ apprentices training under apprenticeship guidelines that included those work processes.  To the extent Balfour Beatty employed apprentices to do this complex pipe work, it employed apprentices who were training under apprenticeship standards, administered by the Northern California District Council of Laborers Joint Apprenticeship Training Committee, that did not include such work.  Balfour Beatty also failed to hire enough Laborer apprentices to meet statutory requirements of a certain ratio of apprentice to journeyman work, regardless of the type of work assigned to those apprentices.

1

1    Nevertheless, Defendant Balfour Beatty and the individually named Defendants billed the

2    public entities without informing them of Balfour Beatty's noncompliance, thus falsely certifying

3    that Balfour Beatty was in compliance with the contracts.  As a result, the public entities paid

4    Balfour Beatty as though it had complied with the law.  Defendant continued its unlawful practices

5    and enriched itself at the expense of the proper training of California workers.  By violating the

6    requirements of California apprenticeship law that were incorporated into its public-works

7    contracts, Balfour Beatty deprived the California public of the benefit of its bargain: the training of

8    a skilled workforce according to a considered statutory and regulatory scheme.

9                                            **JURISDICTION**

10    1.    This action was originally filed in state court.  Defendant Balfour Beatty removed to

11    federal court claiming diversity and federal-question jurisdiction.  This Court dismissed the original

12    complaint while granting leave to file an amended complaint.  This Court has jurisdiction over this

13    First Amended Complaint to determine its own jurisdiction in the matter.

14                                             **PARTIES**

15    2.    Qui Tam Plaintiffs Bill Haley, Harry Rotz, and Lew Long (collectively, "Qui Tam

16    Plaintiffs") bring this *qui tam* action on behalf of the following California public entities, which

17    are collectively referred to herein as the "Public Entities":  East Bay Municipal Utility District

18    ("EBMUD"); Sacramento County Water Agency ("SCWA"); Freeport Regional Water Authority

19    ("FRWA"); City of Sacramento ("Sacramento"); City of Roseville ("Roseville"); and City of Rio

20    Vista ("Rio Vista").

21    3.    Defendant Balfour Beatty is a Delaware corporation with its principal place of

22    business in Atlanta, Georgia.  Balfour Beatty is a construction contractor doing business in

23    California and other states.  Balfour Beatty has performed public-works projects in Northern

24    California within the last ten years for which it has been paid more than $562 million in public

25    funds.  These projects are listed in Paragraph 33 and include but are not limited to a project for the

26    Sacramento County Water Agency in Sacramento, California entitled "Vineyard Water Treatment

27    Plant" ("SCWA Vineyard project").  Each of these projects has been a "public work" as defined

28    by Labor Code § 1720.  On each of these projects, Balfour Beatty has entered into a public-works

First Amended Complaint for False Claims                      Case No. 13-cv-02032-WHO

contract with one or more Public Entities and has employed workers to perform "pipefitter-steamfitter work processes," a term defined in Paragraph 19.

4.      Defendant Crandall Bates has been and is now a Vice President and Regional Manager for Balfour Beatty.  Qui Tam Plaintiffs are informed and believe and thereupon allege that he is a Responsible Managing Officer (RMO) for Balfour Beatty.  As RMO, Defendant Crandall Bates is the qualifier for Balfour Beatty's contractor's license.  In that capacity he is required by California Business and Professions Code § 7068.1 to exercise direct supervision and control over the operations of Balfour Beatty and is responsible for ensuring compliance with state law.  Defendant Crandall Bates is also responsible for overseeing and authorizing the bidding and carrying out of public-works contracts by Balfour Beatty in the state of California.  Qui Tam Plaintiffs are informed and believe and thereupon allege that Defendant Crandall Bates has directly supervised and controlled the operations of Balfour Beatty with respect to the public-works contracts specified in this complaint, including the acts herein alleged, and that he personally participated in the acts of making false claims for payment to the public entities despite Balfour Beatty's noncompliance with state labor law.  Crandall Bates is a resident of Solano County, California.  Defendant Crandall Bates was previously sued herein as Defendant Doe 1.

5.      Defendant Reginald B. Chamberlain was a Project Manager for Balfour Beatty.  He signed or was otherwise responsible for certifying and submitting claims for payment for the Fairbairn, Roseville Dry Creek, Freeport, and Rio Vista projects described herein.  Reginald B. Chamberlain is a resident of Sacramento County, California.  He was previously sued herein as Defendant Doe 2.

6.      Defendant C. William Clark was a Project Manager for Balfour Beatty.  He signed and was responsible for certifying and submitting claims for payment for the Rio Vista project described herein.  C. William Clark is a resident of Napa County, California.  He was previously sued herein as Defendant Doe 3.

7.      Defendant Brian Miller was a Project Manager for Balfour Beatty.  He signed and was responsible for certifying and submitting claims for payment for the Roseville Dry Creek Project described herein.  Brian Miller is a resident of Placer County, California.  He was

3

previously sued herein as Defendant Doe 4.

8.    Defendant Travis Price was a Project Manager for Balfour Beatty.  He caused to be created and submitted claims for payment for the Vineyard Project described herein.  Travis Price is a resident of El Dorado County, California.  He was previously sued herein as Defendant Doe 5.

9.    Chris Rutherford was a Project Manager for Balfour Beatty.  He signed and/or caused to be submitted claims for payment for the Vineyard and Roseville Granite Bay projects described herein.  Chris Rutherford is a resident of Sacramento County, California.  He was previously sued herein as Defendant Doe 6.

10.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as Does 7 through 100 are presently unknown to Qui Tam Plaintiffs Haley, Rotz, and Long, who therefore sue said Defendants by fictitious names.  Each fictitiously named Defendant is in some manner responsible or liable for the unlawful acts and omissions alleged herein.  On leave of Court, Qui Tam Plaintiffs Haley, Rotz, and Long will amend this complaint to show the true names and capacities of Does 7 through 100 when the same have been ascertained.  Liability under the FCA is joint and several for any act committed by two or more persons.  Government Code § 12651(c).

## BALFOUR BEATTY'S FALSE CLAIMS

11.    Pursuant to California Government Code § 12655(c), the FCA is liberally construed and applied to promote the public interest.  The FCA's purposes are to discourage the filing of false and fraudulent claims with governmental entities; to deter fraud, unfair business practices, and other injustices by discouraging false claims that might otherwise provide a means of hiding such injustices; to promote the discovery of false and fraudulent claims; and to penalize persons who present, conspire to present, prepare records and statements to support, and fail to disclose their own false and fraudulent claims to government entities.

12.    During the ten years preceding the commencement of this action, Defendants caused written claims for payment to be made or presented to the Public Entities.  These claims for payment were implied certifications of compliance with express contractual requirements to which Defendant Balfour Beatty had bound itself in public-works contracts with those entities.  The

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

certifications were false, in that Balfour Beatty failed to meet the public-works contracts'
requirements that Balfour Beatty comply with the prevailing wage law's apprenticeship provisions.
Defendants made the implied certifications with actual knowledge that they were false, or with
deliberate ignorance or in reckless disregard of the certifications' falsity.  The certifications are
therefore false claims that Defendants have supported with false statements and records, the falsity
of which Defendants have never voluntarily disclosed to the Public Entities.

13.    Defendants' acts and omissions in preparing and presenting false claims for payment
to the Public Entities had the natural tendency to influence the Public Entities' decisions to pay for
the goods and services Balfour Beatty provided on its public-works projects.  Indeed, in return for
Defendants' claims for payment, the Public Entities paid Balfour Beatty to continue performing
public-works projects.

14.    Defendants had actual or constructive knowledge, or recklessly disregarded, that the
many millions of dollars for which they have billed the Public Entities, while falsely certifying
compliance with Balfour Beatty's contracts with those entities, exceeded the amount to which
Balfour Beatty was actually entitled.

### APPRENTICE EMPLOYMENT ON PUBLIC WORKS

15.    Labor Code § 1777.5 requires public-works contractors to employ and train
apprentices from State-approved apprenticeship programs, and it regulates the manner in which
they must do so.  Section 1777.5 and related regulations require contractors to train each
apprentice only in the work processes that are part of the educational curriculum—*i.e.*, the
apprenticeship standards—of the State-approved apprenticeship program in which the apprentice
is registered.

16.    Under California Code of Regulations, title 8, §§ 200, *et seq.*, the Chief of the
Division of Apprenticeship Standards ("DAS Chief") grants or denies State approval of
apprenticeship programs.  An application for approval must contain, among other things, proposed
apprenticeship standards ("standards") that state the work processes in which trainees of the
program will be trained and employed as apprentices, and the geographical area in which the
proposed program will dispatch apprentices.  (Cal. Code Regs., tit. 8, §§ 205, 212.)

17.    Once approved by the DAS Chief, the apprenticeship standards of any given apprenticeship program govern the work that is to be done by apprentices training in that program.

18.    Some apprenticeship programs are affiliated with labor unions, while others are not. DAS approval of a program's standards is independent of any collective-bargaining agreements to which an apprenticeship program's affiliated union may be a party.

19.    "Pipefitter-steamfitter work processes" are work processes that the DAS Chief has approved for inclusion in apprenticeship standards for pipefitter-steamfitter apprenticeship programs.  On projects of the kind at issue here, "pipefitter-steamfitter work processes" means the following:

- Layout of process piping systems;
- Installation of pressurized and process piping for hot and cold water, steam, gas, chemical process, air and vacuum systems; these work processes include cutting pipe, threading pipe, bending pipe, beveling pipe, welding pipe, soldering pipe, brazing pipe, grooving pipe, and cutting and assembling glass, fiberglass and plastic pipe;
- Welding processes in connection with pipefitting and steamfitting, including arc welding, tungsten inert gas ("TIG") welding, orbital welding and oxy-acetylene cutting;
- Installation of all equipment appurtenant to process piping, including pumps, compressors, heat exchangers and boilers;
- Installation of cans, inserts and hangers for pipe;
- Installation of pneumatic, hydraulic, and instrumentation tubing and control piping, and calibration of instrumentation tubing;
- Operation and repair of power tools, hand tools and machinery used for pipefitting and steamfitting;
- Handling construction materials and equipment used for pipefitting and steamfitting;
- Rigging of pipe and related equipment;
- Testing of piping systems.

20.    One type of construction work that requires pipefitter-steamfitter work processes is commonly known in the industry as "process piping."  Process piping is typically a major

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

component of industrial plants in which water, other liquids, steam, other gases, or any sort of sludge is conveyed within the plant and is subject to some "process" or treatment.  Process piping often uses pumps to move material through the pipes at high pressure.  It often involves the piping of materials that are at an extremely high or low temperature.  It often involves the piping of materials that are corrosive, toxic, or otherwise hazardous.

21.    The following photograph shows an example of process piping at the Vineyard Water Treatment Plant, with typical characteristics such as a three-dimensional layout, different pipe sizes, connection of multiple pipes into complex manifolds, and the use of high-pressure flanges to join pipe segments:



22.    Pipefitter-steamfitter work processes for the construction and installation of process piping are different from pipelaying work processes.  Pipelaying involves tasks such as joining identical lengths of pipe in a trench; this pipe carries liquids at low pressure outside the confines of the plant or between treatment process facilities.  By contrast, pipefitter-steamfitter work processes in the construction of process piping are much more complex because the process piping systems

First Amended Complaint for False Claims                                    Case No. 13-cv-02032-WHO

themselves are of greater complexity.

23.    Apprenticeship standards for approved California apprenticeship programs list trades or occupations that are included in the apprenticeship standards, along with their corresponding DOT (Dictionary of Occupational Titles) or O*NET codes.  DOT codes were formerly used by the U.S. Department of Labor to classify occupations.  DOT codes now correspond to O*NET codes, which are currently used by the U.S. Department of Labor and other authorities.

24.    Apprenticeship standards for programs approved to train in pipefitter-steamfitter work processes list "Pipefitter" with a DOT Code of 862.281 022 or an O*NET code of 47-2152.01.

25.    Each state-approved apprenticeship program, or the local union with which it is affiliated, maintains a list of apprentices eligible for employment known as an "out-of-work list." When apprentices become unemployed, they register on the appropriate out-of-work list.  On receiving a request from an employer, one or more apprentices are dispatched from the out-of-work list.

26.    Before commencing work on a public-works project involving pipefitter-steamfitter work processes, Defendant Balfour Beatty has been and is required by Labor Code §§ 1777.5(c) and (e) to notify a State-approved pipefitter-steamfitter apprenticeship program in the geographic area of the project, so that apprentices can be dispatched to it.  Labor Code §§ 1777.5(c) and (e) require Balfour Beatty to send the apprenticeship program information including, *inter alia*, notice of the contract award, the estimated number of journeyman hours of work to be performed in pipefitter-steamfitter work processes, the number of pipefitter-steamfitter apprentices to be employed, and the approximate dates the apprentices will be employed.

27.    Labor Code § 1777.5(b) requires Defendant Balfour Beatty to employ each apprentice at work only in the craft or trade in which that apprentice is registered.

28.    Labor Code §§ 1777.5(d) and (g) require that pipefitter-steamfitter apprentices be employed to perform pipefitter-steamfitter work processes according to a ratio of no less than one hour of apprentice work for every five hours of journeyman work in pipefitter-steamfitter work

8

processes.  Labor Code §§ 1777.5(c) and (d) provide that apprentice prevailing wage rates may be paid to apprentices who are enrolled in an apprenticeship training program whose training standards have been approved by the DAS Chief, and only to such apprentices.

29.     Labor Code § 1777.5(d) defines "apprenticeable craft or trade" as "a craft or trade determined as an apprenticeable occupation in accordance with rules and regulations prescribed by the California Apprenticeship Council."

30.     The materiality of the requirements in Labor Code § 1777.5 is demonstrated by Labor Code § 1777.7, which provides penalties for a public-works contractor's failure to comply with § 1777.5.

31.     California Code of Regulations, title 8, §§ 205, 210, 212, 230.1 and related provisions require contractors, *inter alia*: to notify the appropriate apprenticeship program(s) when they are awarded a public-works contract, and to provide certain project-related information to the program(s); to employ appropriate apprentices in a timely manner; to request the dispatch of required apprentices from an apprenticeship committee providing training in the craft or trade applicable to the work processes required by the construction project in question; to assign apprentices to perform work only in the craft or trade in which the apprentice is registered; to provide apprentices with on-the-job training in accordance with the apprenticeship standards under which the apprentice is training; to provide apprentices with on-the-job training in accordance with their apprentice agreements, which are registered with the DAS; and to assign each apprentice to train in tasks that provide on-the-job training in the work processes of his or her apprenticeship program's standards.

**BALFOUR BEATTY'S CONTRACT VIOLATIONS**

32.     During the time period relevant to this suit, Defendants impliedly certified to the Public Entities that Balfour Beatty had complied with its public-works contracts even though Balfour Beatty was not in compliance with those contracts.

33.     The public-works projects at issue in this lawsuit are the following:

- A project for the Sacramento County Water Agency (SCWA) known as the Vineyard Water Treatment Plant project in Sacramento, California ("Vineyard Project");

9

- A project for the East Bay Municipal Utility District (EBMUD) known as the Folsom South Canal Connection project in Sacramento, San Joaquin and Calaveras counties in California ("South Canal Project");

- A project for the Freeport Regional Water Authority (FRWA) known as the Freeport Regional Water Intake Facilities project in Sacramento, California ("Freeport Project");

- A project for the City of Sacramento, California known as the E. A. Fairbairn Treatment Plant Expansion project ("Fairbairn Project");

- Projects for the City of Roseville, California known as the Granite Bay Water Treatment Plant project, also known as the Roseville Water Treatment Plant Expansion Phase III ("Roseville Granite Project"); and the Dry Creek Wastewater Treatment Plant Expansion project, also known as the City of Roseville UV Conversion Project ("Roseville Dry Creek Project"); and

- A project for the City of Rio Vista, California known as the Rio Vista Wastewater Treatment Plant project ("Rio Vista Project").

## THE VINEYARD PROJECT

34.    Balfour Beatty entered into a contract on or about January 29, 2008 with the Sacramento County Water Agency to furnish all labor, materials, tools, and equipment for the Vineyard Surface Water Treatment Plant.

35.    The project included the construction of a 50-million-gallon-per-day water treatment plant that was to use coagulation, flocculation, sedimentation, filtration, and chlorine disinfection to treat water; a 24-million-gallon treated water clearwell/chlorine contact tank; a 7,000 horsepower treated water pump station and electrical building; solids handling facilities consisting of gravity thickeners, thickened sludge homogenizing tank, and centrifuges; an administrative building; a warehouse/shop building; and other facilities and sitework.

36.    The specifications and plans for the Vineyard Project included significant amounts of process piping that required pipefitter-steamfitter work processes in its construction and installation.

37.    When Balfour Beatty and SCWA entered into the Vineyard contract on or about

10

January 29, 2008, the estimated total contract amount was $207,249,000.

38.    The Vineyard contract explicitly required Balfour Beatty to comply with California apprenticeship law.

39.    The Vineyard contract made payment to Balfour Beatty conditional upon, among other things, Balfour Beatty's compliance with its legal responsibilities under the Labor Code, including its apprenticeship responsibilities.

40.    Section 6-1.05 of the SCWA Vineyard contract provides: "The Contractor shall comply with Labor Code Section 1777.5, concerning the employment of apprentices. The Contractor shall be responsible for compliance by all Subcontractors."

41.    Section 6-1.05 further provides that if Balfour Beatty willfully fails to comply with California Labor Code § 1777.5 and related laws concerning the employment of apprentices, Balfour Beatty will be subject to the penalties for noncompliance provided in Labor Code § 1777.7.

42.    Section 8-7.02 of the Contract states "[t]he Agency may also retain portions of a Progress of Final Payment for Contract non-compliance in an amount deemed appropriate by the Agency."

43.    Section 8-8 of the Contract (entitled Withholdings/Denial of Progress Payment Request) states that "[t]he Agency may also deny a Progress Payment request and/or withhold money, or modify any previous Progress Payment, as necessary to protect the Agency from loss due to or affect enforcement of: . . .  Any violation or non-compliance with Contractor's legal responsibilities (see Section 6, 'Legal Relations and Responsibilities,' of these Specifications), including withholds for wages adjustments in accordance with California Labor Code Section 1727 and any fines incurred by the Agency as a result of the Contractor's action."

44.    Prior to commencing work on the Vineyard Project, Balfour Beatty did not notify or request apprentices from any approved apprenticeship programs that train in pipefitter-steamfitter work processes.

45.    Although Balfour Beatty employees performed pipefitter-steamfitter work processes on the project, Balfour Beatty did not employ any apprentices on the Vineyard Project who were

First Amended Complaint for False Claims                              Case No. 13-cv-02032-WHO

training under apprenticeship standards that included pipefitter-steamfitter work processes.

46.     To the extent Balfour Beatty employed any apprentices to construct or install any process piping or to do any other pipefitter-steamfitter work processes, those apprentices were training under the apprenticeship standards of the Northern California District Council of Laborers Construction Craft Laborer Joint Apprenticeship Training Committee ("Laborers JATC")  or under some other apprenticeship program, the apprenticeship standards of which did not include pipefitter-steamfitter work processes.

47.     The Laborers apprenticeship program from which Balfour Beatty hired its apprentices is not approved to train apprentices in pipefitter-steamfitter work processes.

48.     The Laborers apprenticeship program from which Balfour Beatty hired its apprentices does not include in its apprenticeship standards many essential component skills of pipefitter-steamfitter work processes.

49.     The Laborers JATC apprenticeship standards approved by the California DAS list a single occupation title and code: "Construction Craft Laborer," DOT Code 869.463 580.  This corresponds to O*NET Code 47-2061.00, "Construction Laborers."

50.     For most of the time period when it was constructing the Vineyard Project, Balfour Beatty employed journeymen Laborers to do various types of work on the project.

51.     Among other things, certain of these Laborer journeymen carried out pipefitter-steamfitter work processes and constructed or installed process piping.

52.     Laborer journeymen also performed other types of work besides pipefitter-steamfitter work processes at the Vineyard Project.

53.     For the project as a whole, Balfour Beatty did not employ enough Laborer apprentices to meet the ratio required by statute.

54.     Over the entire course of the Vineyard project, Balfour Beatty employed Laborer apprentices for approximately 9,434 hours of work.

55.     Over the entire course of the Vineyard project, Balfour Beatty employed Laborer journeymen including foremen for approximately 166,691.5 hours of work.  Balfour Beatty employed Laborer journeymen excluding foremen for approximately 136,128 hours of work.

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

56. The ratio of Laborer apprentice hours to Laborer journeyman hours on the Vineyard Project, if foremen are counted among the journeymen, was approximately one to eighteen (1:18); if foremen are not counted, it was approximately one to fourteen (1:14).

57. Balfour Beatty's employment of Laborer apprentices thus fell far short of the 1:5 hours ratio required by Labor Code § 1777.5 and the Vineyard contract.

58. From approximately March 2008 to approximately January 2012, Balfour Beatty made claims to the Sacramento County Water Agency for payment for its work on the Vineyard Project. These claims were made in the form of monthly "Progress Payment Estimates" that listed work that had been done on the project each month. Each monthly claim was submitted after the end of the month for which payment was requested.

59. Defendants Balfour Beatty, Chris Rutherford, and Travis Price caused these Progress Payment Estimates to be created and presented to SCWA as claims for payment on the Vineyard contract.

60. The Progress Payment Estimates implied a certification by the Defendants that Balfour Beatty had met all of its contractual obligations, including the work listed as completed by the date of the estimate as well as compliance with the legal requirements of the contract.

61. Qui Tam Plaintiffs are informed and believe and thereupon allege that when Defendants submitted the monthly Progress Payment Estimates, Defendants knew, were deliberately ignorant, or were reckless with regard to the truth of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the Vineyard Project.

62. When they submitted the monthly Progress Payment Estimates, Defendants did not inform SCWA of Balfour Beatty's violations of Labor Code § 1777.5 on the Vineyard Project.

63. SCWA made regular payments to Balfour Beatty because of Defendants' submittal of these Progress Payment Estimates.

64. Qui Tam Plaintiffs are informed and believe and thereupon allege that SCWA would not have made these payments had Balfour Beatty not contractually obligated itself to obey Labor Code § 1777.5. Nor would SCWA have paid Balfour Beatty the full amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship law.

13

65.    Qui Tam Plaintiffs are informed and believe and thereupon allege that at some time after January 2012, Balfour Beatty submitted a final claim for payment for all remaining funds owed to it under the Vineyard Contract.  This final claim did not include disclosure of Balfour Beatty's violations of Labor Code § 1777.5  Based upon this final claim, SCWA paid or released to Balfour Beatty the remainder of the money owed by the terms of the contract.

### THE SOUTH CANAL PROJECT

66.    Balfour Beatty entered into a contract on or about June 12, 2007 with the East Bay Municipal Utility District (EBMUD) to furnish all labor, materials, tools, and equipment for the Folsom South Canal Connection Project including the Clay Station Raw Water Pumping Plant, the Camanche Raw Water Pumping Plant, the Brandt Flow Splitting and Campo Seco Improvements.

67.    Officers of Balfour Beatty signed the contract first.  An officer of EBMUD then signed the contract at EBMUD's headquarters in Oakland, California, which was the last act necessary to form a valid contract.

68.    The project consisted of the construction of two new pumping plants with a capacity of 100 million gallons per day, including piping, turbine pumps, tanks, reservoirs, as well as a flow-splitting facility, along with related work that was part of a larger pipeline project.

69.    The specifications and plans for the EBMUD project included significant amounts of process piping that required pipefitter-steamfitter work processes in their construction and installation.

70.    For example, the specifications called for the installation of site piping, valves, and tanks at two high-capacity pumping plants.  The specifications also called for the construction of a splitting facility for water flow that contained a valve structure, flowmeters, and other instruments. Schematic drawings and detailed plans included in the contract specifications call for various types of process piping at several of the sites included in the contract.

71.    When Balfour Beatty and EBMUD entered into the contract, the estimated total contract amount was $93,185,000.

72.    The contract explicitly required Balfour Beatty to comply with California apprenticeship law.

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

73.    Section 12.4.1 of the contract explicitly required Balfour Beatty to comply with "the provisions concerning the employment of apprentices in Section 1777.5 of the Labor Code."

74.    Section 12.4.2 of the contract provided that if Balfour Beatty wilfully failed to comply with California apprenticeship law, it would be subject to the penalties for noncompliance provided in Labor Code § 1777.7.

75.    Section 01 29 00 of the contract makes payments to Balfour Beatty by EBMUD contingent on the submission of monthly progress payment requests and certified payrolls for the month for which payment is requested.  The contract requires EBMUD to withhold payment if certified payrolls are not complete or contain errors.

76.    Document 00 50 00, entitled "Execution of Contract," requires the contractor (here Balfour Beatty) to execute the contract and send two copies to the Oakland office of EBMUD. EBMUD is then to execute the contract and provide one copy to the contractor.

77.    Based upon their inspection of a scanned copy of the original signed contract, Plaintiffs are informed and believe and thereupon allege that the last act necessary to form a contract, namely EBMUD's execution of the contract, occurred in Oakland, California on or about July 3, 2007.

78.    Prior to commencing work on the EBMUD Project, Balfour Beatty did not notify or request apprentices from any approved apprenticeship programs that train in pipefitter-steamfitter work processes.

79.    Balfour Beatty did not employ any apprentices on the South Canal Project who were training under apprenticeship standards that included pipefitter-steamfitter work processes.

80.    To the extent Balfour Beatty employed any apprentices to construct or install any process piping or to do any other pipefitter-steamfitter work processes, those apprentices were training under the apprenticeship standards of the Laborers JATC or under some other apprenticeship program the apprenticeship standards of which did not include pipefitter-steamfitter work processes.

81.    Throughout its work on the South Canal Project, Balfour Beatty employed journeymen Laborers to do various types of work on the project.

82.     Among other things, certain of these Laborer journeymen carried out pipefitter-steamfitter work processes and constructed or installed process piping.

83.     Laborer journeymen also performed other types of work besides pipefitter-steamfitter work processes at the South Canal Project.

84.     Although Balfour Beatty employed many Laborer journeymen on the South Canal Project, it employed few if any Laborer apprentices.

85.     Balfour Beatty sometimes had 20 or more Laborer journeymen employed on the project in a given week, while during in that same week not employing any Laborer apprentices.

86.     For the project as a whole, Balfour Beatty did not employ enough Laborer apprentices to meet the hours ratio required by statute.  The ratio of Laborer apprentice hours to Laborer journeyman hours on the South Canal Project was much lower than one to five (1:5), in violation of Labor Code § 1777.5.

87.     From approximately August 2007 to August 2011, Balfour Beatty made claims to EBMUD for payment for its work on the South Canal Project.  These claims were made in the form of monthly progress payment estimates or invoices.  Qui Tam Plaintiffs are informed and believe and on this basis allege that Defendants Does 7, 8, and 9 submitted Balfour Beatty's claims for payment.  Each monthly claim listed the work that had been done on the project for the month for which payment was requested.  Each monthly claim was submitted after the end of the month for which payment was requested.

88.     Defendant Balfour Beatty caused these monthly progress estimates to be created and presented to EBMUD as claims for payment on the South Canal project.

89.     The monthly claims for payment implied a certification by Balfour Beatty that Balfour Beatty had met all of its contractual obligations including the work listed as completed by the date of the estimate as well as the legal requirements of the contract.

90.     Qui Tam Plaintiffs are informed and believe and thereupon allege that when they submitted the monthly progress estimates, Balfour Beatty knew, was deliberately ignorant, or was reckless with regard to the truth of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the South Canal Project.

16

91.     When they submitted the monthly progress estimates for payment, Balfour Beatty did not inform EBMUD of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the South Canal Project.

92.     EBMUD made regular payments to Balfour Beatty because of the submittal of these progress estimates and accompanying documentation, including certified payrolls.

93.     Qui Tam Plaintiffs are informed and believe and thereupon allege that EBMUD would not have made these payments had Balfour Beatty not contractually obligated itself to obey Labor Code § 1777.5.  Nor would EBMUD have paid Balfour Beatty the full amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship law.

94.     EBMUD accepted Balfour Beatty's work on the South Canal Project as complete as of May 26, 2011.

95.     Balfour Beatty submitted a final payment request for its work on the project on or about August 3, 2011, accompanied by a release signed by Defendant Crandall Bates.

96.     The total amount paid by EBMUD to Balfour Beatty for its work on the South Canal Project was about $96,140,298.14.

97.     At no point prior to EBMUD making its final payment to Balfour Beatty did the company or any of its employees or agents inform EBMUD of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the South Canal Project.

**THE FREEPORT PROJECT**

98.     Balfour Beatty entered into a contract on or about November 29, 2006 with the Freeport Regional Water Authority of Sacramento, California, to perform all work specified for the Freeport Intake Facilities Project.

99.     The Freeport Regional Water Authority is a joint-powers authority formed by agreement of EBMUD and the Sacramento County Water Agency.

100.    The project included the construction of a new water intake facility and pumping plant on the Sacramento River.  The plant includes eight vertical turbine pumps which together have the capacity to pump 185 million gallons of water per day.  The plant also includes a compressed air system, a settling basin system to remove sediment from pumped water, and other

17

components.

101.    The specifications and plans for the Freeport Project included significant amounts of process piping that required pipefitter-steamfitter work processes in the project's construction and installation.

102.    The estimated total contract amount at the time the contract was entered into was $120,523,000.

103.    Paragraph 18 of the "Agreement" portion of the contract required Balfour Beatty to comply with all of Labor Code Part 7, Chapter 1.  Paragraph 18 also incorporated this portion of the Labor Code into the contract by reference.  Included in Part 7, Chapter 1 of the Labor Code is § 1777.5.

104.    Section 70.16 of the General Conditions of the contract specifically required Balfour Beatty to comply with the apprenticeship provisions of the Labor Code.

105.    Prior to commencing work on the Freeport Project, Balfour Beatty did not notify or request apprentices from any approved apprenticeship programs that train in pipefitter-steamfitter work processes.

106.    Although Balfour Beatty employees performed pipefitter-steamfitter work processes on the project, Balfour Beatty did not employ any apprentices on the Freeport Project who were training under apprenticeship standards that included pipefitter-steamfitter work processes.

107.    To the extent Balfour Beatty employed any apprentices to construct or install any process piping or to do any other pipefitter-steamfitter work processes, those apprentices were training under the apprenticeship standards of the Laborers JATC  or under some other apprenticeship program the apprenticeship standards of which did not include pipefitter-steamfitter work processes.

108.    The Laborers apprenticeship program from which Balfour Beatty hired its apprentices is not approved to train apprentices in pipefitter-steamfitter work processes.

109.    The Laborers apprenticeship program from which Balfour Beatty hired its apprentices does not include in its apprenticeship standards many essential component skills of pipefitter-steamfitter work processes.

110.    Qui Tam Plaintiffs are informed and believe and on that basis allege that Balfour Beatty extensively employed Laborer journeymen to do various types of work on the Freeport Project.

111.    Qui Tam Plaintiffs are informed and believe and on that basis allege that Balfour Beatty did not employ sufficient Laborer apprentices on the Freeport Project to meet the ratio requirement of one apprentice hour for every five journeyman hours in an apprenticeable craft or trade.

112.    The basis for Qui Tam Plaintiffs' beliefs in the preceding two paragraphs includes their knowledge of the construction industry and in particular public-works construction in Northern California, their knowledge of Balfour Beatty's labor practices during the time periods when the Freeport Project was carried out, and the similarity between the Freeport Project and other public-works water infrastructure projects completed by Balfour Beatty during the time period at issue in this action.

113.    From approximately December 2006 until at least August 2009, Balfour Beatty made claims to the Freeport Regional Water Authority for payment for its work on the Freeport Project.  These claims were made in the form of monthly progress payment requests or invoices that listed work that had been done on the project each month.  Each monthly claim was submitted after the end of the month for which payment was requested.

114.    Defendants Balfour Beatty and Reginald B. Chamberlain caused these progress payment requests to be created and submitted to Freeport Regional Water Authority as claims for payment for the Freeport contract.  Reginald B. Chamberlain signed each request before it was submitted to FRWA.

115.    The progress payment requests implied a certification by the Defendants that Balfour Beatty had met all of its contractual obligations, including the work listed as completed by the date of the request as well as the legal requirements of the contract.

116.    Qui Tam Plaintiffs are informed and believe and thereupon allege that when they submitted the monthly progress payment requests, Defendants knew, were deliberately ignorant, or were reckless with regard to the truth of Balfour Beatty's noncompliance with Labor Code §

1777.5 in its work on the Freeport Project.

117.    When they submitted the monthly progress payment requests, Defendants did not inform FRWA of Balfour Beatty's violations of Labor Code § 1777.5 on the Vineyard Project.

118.    FRWA made regular payments to Balfour Beatty because of Defendants' submittal of these progress payment requests.

119.    Qui Tam Plaintiffs are informed and believe and on that basis allege that FRWA would not have made these payments had Balfour Beatty not contractually obligated itself to obey Labor Code § 1777.5.  Nor would FRWA have paid Balfour Beatty the full amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship law.

120.    Qui Tam Plaintiffs are informed and believe and thereupon allege that at some time after August 2009, Balfour Beatty submitted a final claim or claims for payment of all remaining funds owed to it under the Freeport Contract and for the release of all reserved or withheld payments due under the contract.  This final claim did not include disclosure of Balfour Beatty's violations of Labor Code § 1777.5  Based upon this final claim, FRWA paid and/or released to Balfour Beatty the remainder of the money owed by the terms of the contract.

## THE FAIRBAIRN PROJECT

121.    In 2002 Balfour Beatty entered into a contract with the City of Sacramento to carry out the E.A. Fairbairn Water Treatment Plant Expansion project.

122.    The Fairbairn Project consisted of the construction of a new 60-million-gallon-per-day treatment train for producing drinking water for the City of Sacramento.  It also included the modernization of some existing facilities on the site.

123.    The original contract amount was $53,150,235.

124.    The Fairbairn Project required the construction and installation of process piping, which work required pipefitter-steamfitter work processes.

125.    Qui Tam Plaintiffs are informed and believe and on that basis allege that the contract required Balfour Beatty to comply with applicable labor laws, including the apprenticeship requirements of the California Labor Code.

126.    Prior to commencing work on the Fairbairn Project, Balfour Beatty did not notify or

request apprentices from any approved apprenticeship programs that train in pipefitter-steamfitter work processes.

127.   Although Balfour Beatty employees performed pipefitter-steamfitter work processes on the project, Balfour Beatty did not employ any apprentices on the Fairbairn Project who were training under apprenticeship standards that included pipefitter-steamfitter work processes.

128.   To the extent Balfour Beatty employed any apprentices to construct or install any process piping or to do any other pipefitter-steamfitter work processes, those apprentices were training under the apprenticeship standards of the Laborers JATC or under some other apprenticeship program, the apprenticeship standards of which did not include pipefitter-steamfitter work processes.

129.   The Laborers apprenticeship program from which Balfour Beatty hired its apprentices is not approved to train apprentices in pipefitter-steamfitter work processes.

130.   The Laborers apprenticeship program from which Balfour Beatty hired its apprentices does not include in its apprenticeship standards many essential component skills of pipefitter-steamfitter work processes.

131.   For most of the time period when it was constructing the Fairbairn Project, Balfour Beatty employed journeymen Laborers to do various types of work on the site.

132.   Among other things, certain of these Laborer journeymen carried out pipefitter-steamfitter work processes and constructed or installed process piping.

133.   Laborer journeymen also performed other types of work besides pipefitter-steamfitter work processes at the Fairbairn Project.

134.   For the Fairbairn Project as a whole, Balfour Beatty did not employ enough Laborer apprentices to meet the hours ratio required by statute.

135.   Balfour Beatty employed few if any Laborer apprentices on the Fairbairn Project, such that the ratio of Laborer apprentice hours to journeyman hours on the project was much less than 1:5.

136.   From approximately May 2002 until at least November 2005, Balfour Beatty made claims to the City of Sacramento for payment for its work on the Fairbairn Project.  These claims

were made in the form of monthly "Project Pay Estimates" that listed work that had been done on the project each month.  Each monthly claim was submitted at or after the end of the month for which payment was requested.

137.    Defendants Balfour Beatty, Reginald B. Chamberlain, and Chris Rutherford caused these pay requests to be created, signed, and presented to the City of Sacramento as claims for payment on the Fairbairn contract.

138.    Either Reginald B. Chamberlain or Chris Rutherford signed each claim before it was submitted to the city.

139.    These payment requests implied a certification by the Defendants that Balfour Beatty had met all of its contractual obligations, including the work listed as completed by the date of the estimate as well as compliance with the legal requirements of the Fairbairn contract.

140.    Qui Tam Plaintiffs are informed and believe and thereupon allege that when they submitted the monthly payment requests, the Defendants knew, were deliberately ignorant about, or were reckless with regard to the truth of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the Fairbairn Project.

141.    When they submitted the monthly payment requests, the Defendants did not inform the City of Sacramento about Balfour Beatty's violations of Labor Code § 1777.5 on the Fairbairn Project.

142.    The City of Sacramento made regular payments to Balfour Beatty because of Defendants' submittal of these Progress Payment Estimates.

143.    Qui Tam Plaintiffs are informed and believe and on that basis allege that the City of Sacramento would not have made these payments had Balfour Beatty not contractually obligated itself to obey Labor Code § 1777.5.  Nor would Sacramento have paid Balfour Beatty the full amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship law.

144.    Qui Tam Plaintiffs are informed and believe and thereupon allege that at some time during or after November 2005, Balfour Beatty submitted a final claim for payment for all remaining funds owed to it under the Fairbairn Contract.  This final claim did not include

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

1    disclosure of Balfour Beatty's violations of Labor Code § 1777.5  Based upon this final claim, the

2    City of Sacramento paid or released to Balfour Beatty the remainder of the money owed by the

3    terms of the contract.

4    **THE ROSEVILLE GRANITE PROJECT**

5    145.    Balfour Beatty entered into a contract with the City of Roseville on or about

6    February 1, 2006, to carry out the Roseville Water Treatment Plant Expansion Phase III.

7    146.    The project included the construction of additional facilities at the Roseville Water

8    Treatment Plant to expand its capacity.  The new construction included new inlets, a new

9    sedimentation basin, a new pump station and other new or expanded pump systems, and other new

10   or expanded treatment systems.

11   147.    The Roseville Granite Project included significant amounts of process piping that

12   required pipefitter-steamfitter work processes in its construction and installation.

13   148.    Balfour Beatty's bid for the Roseville Granite Project was about $5.7 million lower

14   than the next-highest bid for the project.

15   149.    When the contract was formed, the estimated total contract amount was

16   $32,115,843.

17   150.    The Roseville Granite Project contract specifically required Balfour Beatty to

18   comply with the prevailing wage provisions of California law, Labor Code §§ 1770 et seq.  These

19   provisions include the apprenticeship requirements of Labor Code § 1777.5.  The contract also

20   provided for penalties for Balfour Beatty's noncompliance with prevailing wage law.

21   151.    The Roseville Granite Project contract specifically directed Balfour Beatty's

22   attention to Labor Code Sections 1777.5, 1777.6 and 1777.7 and placed responsibility for

23   compliance with those sections on Balfour Beatty.

24   152.    Prior to commencing work on the Roseville Granite Project, Balfour Beatty did not

25   notify or request apprentices from any approved apprenticeship programs that train in pipefitter-

26   steamfitter work processes.

27   153.    Although Balfour Beatty employees performed pipefitter-steamfitter work processes

28   on the project, Balfour Beatty did not employ any apprentices on the Roseville Granite Project

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

1  who were training under apprenticeship standards that included pipefitter-steamfitter work
2  processes.

3      154.    To the extent Balfour Beatty employed any apprentices to construct or install any
4  process piping or to do any other pipefitter-steamfitter work processes, those apprentices were
5  training under the apprenticeship standards of the Laborers JATC or under some other
6  apprenticeship program the apprenticeship standards of which did not include pipefitter-steamfitter
7  work processes.

8      155.    The Laborers apprenticeship program from which Balfour Beatty hired its
9  apprentices is not approved to train apprentices in pipefitter-steamfitter work processes.

10     156.    The Laborers apprenticeship program from which Balfour Beatty hired its
11 apprentices does not include in its apprenticeship standards many essential component skills of
12 pipefitter-steamfitter work processes.

13     157.    Qui Tam Plaintiffs are informed and believe and on that basis allege that Balfour
14 Beatty extensively employed Laborer journeymen to do various types of work on the Roseville
15 Granite Project.

16     158.    Qui Tam Plaintiffs are informed and believe and on that basis allege that Balfour
17 Beatty did not employ sufficient Laborer apprentices on the Roseville Granite Project to meet the
18 ratio requirement of one apprentice hour to every five journeyman hours in an apprenticeable craft
19 or trade.

20     159.    The basis for Qui Tam Plaintiffs' beliefs in the preceding two paragraphs includes
21 their knowledge of the construction industry and in particular public-works construction in
22 Northern California, their knowledge of Balfour Beatty's labor practices during the time periods
23 when the Roseville Granite Project was carried out, and the similarity between the Roseville
24 Granite Project and other public-works water infrastructure projects completed by Balfour Beatty
25 during the time period at issue in this action.

26     160.    From approximately March 2006 until approximately March 2008, Balfour Beatty
27 made claims to the City of Roseville for payment for its work on the Roseville Granite Project.
28 These claims were made in the form of monthly Progress Payment Estimates that listed the work

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

1    that had been done on the project each month.  Each monthly claim was submitted after the end of

2    the month for which payment was requested.

3            161.    Defendant Chris Rutherford caused these claims to be created and presented to the

4    City of Roseville as claims for payment on the Roseville Granite Project.  Chris Rutherford signed

5    each claim before it was submitted to the city.

6            162.    The Progress Payment Estimates implied a certification by the Defendants that

7    Balfour Beatty had met all of its contractual obligations, including the work listed as completed by

8    the date of the estimate as well as compliance with the legal requirements of the Roseville Granite

9    contract.

10            163.    Qui Tam Plaintiffs are informed and believe and thereupon allege that when they

11    submitted the monthly Progress Payment Estimates, the Defendants knew, were deliberately

12    ignorant, or were reckless with regard to the truth of Balfour Beatty's noncompliance with Labor

13    Code § 1777.5 in its work on the Roseville Granite Project.

14            164.    When they submitted the monthly Progress Payment Estimates, Defendants did not

15    inform the City of Roseville of Balfour Beatty's violations of Labor Code § 1777.5 on the

16    Roseville Granite Project.

17            165.    The City of Roseville made regular payments to Balfour Beatty because of

18    Defendants' submittal of these Progress Payment Estimates.

19            166.    Qui Tam Plaintiffs are informed and believe and on that basis allege that the City of

20    Roseville would not have made these payments had Balfour Beatty not contractually obligated

21    itself to obey Labor Code § 1777.5.  Nor would Roseville have paid Balfour Beatty the full

22    amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship

23    law.

24            167.    Qui Tam Plaintiffs are informed and believe and thereupon allege that at some time

25    after April 2008, Balfour Beatty submitted a final claim for payment for all remaining funds owed

26    to it under the Roseville Granite Contract.  This final claim did not include disclosure of Balfour

27    Beatty's violations of Labor Code § 1777.5  Based upon this final claim, the City of Roseville paid

28    or caused to be released to Balfour Beatty the remainder of the money owed under of the contract.

First Amended Complaint for False Claims                              Case No. 13-cv-02032-WHO

1

**THE ROSEVILLE DRY CREEK PROJECT**

2     168.    Balfour Beatty entered into a contract with the City of Roseville in 2006 to carry out

3     the City of Roseville UV Conversion Project at the Dry Creek Wastewater Treatment Plant.

4     169.    The Roseville Dry Creek Project involved the conversion of the Dry Creek plant

5     from using chlorine gas to disinfect effluent to using ultraviolet (UV) light for disinfection.

6     170.    The Roseville Dry Creek Project included significant amounts of process piping that

7     required pipefitter-steamfitter work processes in its construction and installation.

8     171.    Balfour Beatty's bid of $33, 572,170 was about $2.6 million less than the next

9     highest bid for the project.

10    172.    When Balfour Beatty and the city of Roseville entered into the Roseville Dry Creek

11    contract, the total award amount was $33,572,000.

12    173.    The Roseville Dry Creek contract explicitly required Balfour Beatty to comply with

13    "all applicable prevailing wage laws."  Applicable prevailing wage laws included the

14    apprenticeship provisions of the California Labor Code.

15    174.    Prior to commencing work on the Roseville Dry Creek Project, Balfour Beatty did

16    not notify or request apprentices from any approved apprenticeship programs that train in

17    pipefitter-steamfitter work processes.

18    175.    Although Balfour Beatty employees performed pipefitter-steamfitter work processes

19    on the project, Balfour Beatty did not employ any apprentices on the Roseville Dry Creek Project

20    who were training under apprenticeship standards that included pipefitter-steamfitter work

21    processes.

22    176.    To the extent Balfour Beatty employed any apprentices to construct or install any

23    process piping or to do any other pipefitter-steamfitter work processes, those apprentices were

24    training under the apprenticeship standards of the Laborers JATC or under some other

25    apprenticeship program the apprenticeship standards of which did not include pipefitter-steamfitter

26    work processes.

27    177.    The Laborers apprenticeship program from which Balfour Beatty hired its

28    apprentices is not approved to train apprentices in pipefitter-steamfitter work processes.

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

178.    The Laborers apprenticeship program from which Balfour Beatty hired its apprentices does not include in its apprenticeship standards many essential component skills of pipefitter-steamfitter work processes.

179.    For most of the time period when it was constructing the Roseville Dry Creek Project, Balfour Beatty employed journeymen Laborers to do various types of work on the project.

180.    Among other things, certain of these Laborer journeymen carried out pipefitter-steamfitter work processes and constructed or installed process piping.

181.    Laborer journeymen also performed other types of work besides pipefitter-steamfitter work processes at the Roseville Dry Creek Project.

182.    For the project as a whole, Balfour Beatty did not employ enough Laborer apprentices to meet the hours ratio required by statute.

183.    Over the entire course of the Roseville Dry Creek Project, Balfour Beatty employed Laborer apprentices and journeymen in a ratio of approximately one apprentice hour to twenty-two journeymen hours (1:22), far less than the 1:5 ratio required by Labor Code § 1777.5.

184.    From approximately January 2007 to approximately September 2009, Balfour Beatty made claims to the City of Roseville for payment for its work on the Roseville Dry Creek Project.  These claims were made in the form of monthly payment requests that listed work that had been done on the project each month.  Each monthly claim was submitted after the end of the month for which payment was requested.

185.    Defendants Balfour Beatty, Brian Miller, and Reginald B. Chamberlain caused these payment requests to be created and presented to the City of Roseville as claims for payment on the Dry Creek contract.

186.    Either Brian Miller or Reginald B. Chamberlain signed each claim before it was submitted to the city.

187.    The payment requests implied a certification by the Defendants that Balfour Beatty had met all of its contractual obligations, including the work listed as completed by the date of the estimate as well as compliance with the legal requirements of the contract.

188.    Qui Tam Plaintiffs are informed and believe and thereupon allege that when they

27

submitted the monthly payment requests, the Defendants knew, were deliberately ignorant, or were reckless with regard to the truth of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the Roseville Dry Creek Project.

189.    When they submitted the monthly Progress Payment Estimates, the Defendants did not inform the City of Roseville of Balfour Beatty's violations of Labor Code § 1777.5 on the Roseville Dry Creek Project.

190.    The City of Roseville made regular payments to Balfour Beatty because of Defendants' submittal of these Progress Payment Estimates.

191.    Qui Tam Plaintiffs are informed and believe and on that basis allege that the City of Roseville would not have made these payments had Balfour Beatty not contractually obligated itself to obey Labor Code § 1777.5. Nor would Roseville have paid Balfour Beatty the full amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship law.

192.    Qui Tam Plaintiffs are informed and believe and thereupon allege that at some time after September 2009, Balfour Beatty submitted a final claim for payment for all remaining funds owed to it under the Roseville Dry Creek Contract. This final claim did not include disclosure of Balfour Beatty's violations of Labor Code § 1777.5 Based upon this final claim, the City of Roseville paid to Balfour Beatty the remainder of the money owed by the terms of the contract.

### THE RIO VISTA PROJECT

193.    Balfour Beatty entered into a contract in December 2004 with the City of Rio Vista to construct the Northwest Wastewater Treatment Facility.

194.    The Rio Vista Project required the construction of a new wastewater treatment facility that included an influent pump station, headworks, a membrane bioreactor, ultraviolet disinfection, effluent pump station, a blower/electrical/chemical building, and other facilities.

195.    The specifications and plans for the Rio Vista Project included significant amounts of process piping that required pipefitter-steamfitter work processes in its construction and installation.

196.    For example, the project required the construction and/or installation of vertical

turbine pumps, polymer dilution systems, chemical metering pumps, submersible sewage pumps, submersible mixers, air compressors, a grid aeration system, an ultraviolet disinfection system, and other equipment and systems for the processing and treatment of wastewater, including all of the process piping required for those systems.

197.    When the contract was formed, the estimated total contract amount was $24,736,020.

198.    Balfour Beatty represented that it was familiar with all state laws and regulations that may affect its work on the Rio Vista Project.

199.    The contract specifications explicitly required Balfour Beatty to comply with all laws and regulations that were applicable to the project.

200.    Balfour Beatty knew that California prevailing-wage laws for public-works contracts applied to the Rio Vista Project.

201.    Labor Code § 1777.5(n) places responsibility for compliance with California apprenticeship laws on the public-works contractor, here Balfour Beatty.

202.    Prior to commencing work on the Rio Vista Project, Balfour Beatty did not notify or request apprentices from any approved apprenticeship programs that train in pipefitter-steamfitter work processes.

203.    Although Balfour Beatty employees performed pipefitter-steamfitter work processes on the project, Balfour Beatty did not employ any apprentices on the Rio Vista Project who were training under apprenticeship standards that included pipefitter-steamfitter work processes.

204.    To the extent Balfour Beatty employed any apprentices to construct or install any process piping or to do any other pipefitter-steamfitter work processes, those apprentices were training under the apprenticeship standards of the Laborers JATC or under some other apprenticeship program the apprenticeship standards of which did not include pipefitter-steamfitter work processes.

205.    The Laborers apprenticeship program from which Balfour Beatty hired its apprentices is not approved to train apprentices in pipefitter-steamfitter work processes.

206.    The Laborers apprenticeship program from which Balfour Beatty hired its

29

First Amended Complaint for False Claims                    Case No. 13-cv-02032-WHO

apprentices does not include in its apprenticeship standards many essential component skills of pipefitter-steamfitter work processes.

207.   For most of the time period when it was constructing the Rio Vista Project, Balfour Beatty employed journeymen Laborers to do various types of work on the site.

208.   Among other things, certain of these Laborer journeymen carried out pipefitter-steamfitter work processes and constructed or installed process piping.

209.   Laborer journeymen also performed other types of work besides pipefitter-steamfitter work processes at the Rio Vista Project.

210.   For the project as a whole, Balfour Beatty did not employ enough Laborer apprentices to meet the hours ratio required by statute.

211.   For the entire duration of the Rio Vista project, Balfour Beatty employed no more than a few Laborer apprentices.

212.   The ratio of Laborer apprentice hours to Laborer journeyman hours on the Rio Vista project was much lower than one to five (1:5), in violation of Labor Code § 1777.5.

213.   From approximately January 2005 to July 2006, Balfour Beatty made claims to the City of Rio Vista for payment for its work on the Rio Vista Project.  These claims were made in the form of monthly Progress Payment Estimates that listed the work that had been done on the project each month.  Each monthly claim was submitted after the end of the month for which payment was requested.

214.   Defendants Balfour Beatty, Reginald B. Chamberlain, and C. William Clark caused these Progress Payment Estimates to be created and presented to the City of Rio Vista as claims for payment on the Rio Vista Project.

215.   Either Reginald B. Chamberlain or C. William Clark signed each claim before it was submitted to the city.

216.   The Progress Payment Estimates implied a certification by the Defendants that Balfour Beatty had met all of its contractual obligations, including the work listed as completed by the date of the estimate as well as the legal requirements of the contract.

217.   Qui Tam Plaintiffs are informed and believe and thereupon allege that when they

submitted the monthly Progress Payment Estimates, the Defendants knew or were reckless with regard to the truth of Balfour Beatty's noncompliance with Labor Code § 1777.5 in its work on the Rio Vista Project.

218.    When they submitted the monthly Progress Payment Estimates, the Defendants did not inform the City of Rio Vista of Balfour Beatty's violations of Labor Code § 1777.5 on the Rio Vista Project.

219.    The City of Rio Vista made regular payments to Balfour Beatty because of Defendants' submittal of these Progress Payment Estimates.

220.    Qui Tam Plaintiffs are informed and believe and on that basis allege that the City of Rio Vista would not have made these payments had Balfour Beatty not contractually obligated itself to obey Labor Code § 1777.5.  Nor would the City of Rio Vista have paid Balfour Beatty the full amount it claimed had Balfour Beatty disclosed its noncompliance with California apprenticeship law.

221.    Qui Tam Plaintiffs are informed and believe and thereupon allege that the City of Rio Vista paid Balfour Beatty more than $25 million for the Rio Vista Project.  These payments were based upon claims submitted by Balfour Beatty, including a final claim for payment and release of escrowed or withheld funds.  These claims, including the final claim, did not disclose Balfour Beatty's violations of Labor Code § 1777.5.

**HARM TO THE PUBLIC ENTITIES**

222.    The public policy of the State of California, as manifested by the Legislature in Labor Code §§ 1777.5 et seq., makes clear that the Public Entities described herein did not merely contract with Balfour Beatty for water infrastructure projects.  They also contracted for Balfour Beatty to employ and train apprentices in the skilled occupations that were involved in the construction of the public-works projects.  This training was part of the benefit of the bargain that the Public Entities made, as required by law, when they agreed to pay public funds to Balfour Beatty.  The training was to benefit the Public Entities as well as the entire state by contributing to the sustainability of California's skilled workforce and by providing a pathway for young Californians to receive specialized on-the-job training at the beginning their careers in the

31

1    construction industry.

2        223.    Defendant Balfour Beatty violated its public-works contracts by failing to employ

3    and train pipefitter-steamfitter apprentices as required by law even though there were pipefitter-

4    steamfitter apprentices registered for work on the pipefitter-steamfitter out-of-work lists in the

5    geographic areas where Defendant was performing public-works projects that involved many hours

6    of pipefitter-steamfitter work processes.  As a result, pipefitter-steamfitter apprentices have been

7    denied wages and training to which they have been entitled, and California's apprenticeship-

8    training system and the Public Entities' local workforces have suffered.

9        224.    As a result of Defendants' conduct, the Public Entities have been damaged in a sum

10    greatly exceeding $25,000, in an amount to be determined at trial.  Among other damages and

11    related injuries, the Public Entities have paid Balfour Beatty monies to which it was not entitled.

12    Moreover, Defendants' unlawful conduct has undermined the maintenance of California's skilled

13    workforce (especially in the Public Entities' regions), has injured California's apprenticeship

14    system and State-approved apprenticeship programs, has adversely impacted the economy and tax

15    revenue of Public Entities by depriving local apprentices of work, and has damaged the Public

16    Entities' ability to obtain sufficient skilled labor to efficiently and effectively build public-works

17    projects.  Because of Defendants' contract violations, Balfour Beatty was not entitled to full

18    payment under the contracts it violated.

19        225.    Defendants have violated the law and their contractual obligations willfully,

20    knowingly and recklessly.  While honest contractors took pains to comply with the law, Defendants

21    achieved cost savings and a competitive advantage by lying to the government, breaching Balfour

22    Beatty's contracts, and violating the apprenticeship laws by which Balfour Beatty had covenanted

23    to abide.

24        226.    All applicable accrual doctrines and doctrines that toll limitations periods—including

25    but not limited to fraudulent concealment, equitable estoppel, equitable tolling, continuing

26    violation, and continual accrual—apply here.  Defendants have used the false claims described

27    herein to conceal their wrongdoing and bid on public-works projects without the Public Entities'

28    knowing that Defendants have in fact been making false claims and violating Balfour Beatty's

contracts.

# CAUSES OF ACTION

227.    Qui Tam Plaintiffs Haley, Rotz, and Long bring the causes of action below on behalf of the Public Entities and against Defendant Balfour Beatty under the California False Claims Act, Government Code § 12650, *et seq.*, and related law, including but not limited to Government Code § 12652(c), to seek redress for Defendant's violations of law between September 1, 2002 and the present.  Government Code § 12654(a).

## FIRST CAUSE OF ACTION
### Presentation of False Claims
(Government Code § 12650 *et seq.*; § 12651(a)(1))

228.    Qui Tam Plaintiffs Haley, Rotz, and Long reallege and incorporate herein by reference the allegations contained in Paragraphs 1 through 226.

229.    By doing the acts described above, Defendants have presented or caused to be presented false or fraudulent claims for payment or approval to each Public Entity, or to an officer or employee of each Public Entity, in violation of Government Code § 12651(a)(1) and related law. The claims were false or fraudulent because they impliedly certified that Balfour Beatty was employing and training apprentices in accordance with the applicable state-approved apprenticeship standards as required by Labor Code § 1777.5(c).

230.    In presenting these false claims, Defendants have acted with actual knowledge, in deliberate ignorance, or in reckless disregard of the falsity of the information involved, presented, or caused to be presented.

231.    The Public Entities have been unaware of the falsity of Defendants' statements, claims, misrepresentations and omissions.  In reliance on Defendants' claims, misrepresentations and omissions, the Public Entities have paid Balfour Beatty many millions of dollars for the construction of their public-works projects.

232.    As a result of Defendants' actions, claims, misrepresentations, omissions and implied certifications described above, each Public Entity has been and continues to be severely injured and

damaged.  Where Balfour Beatty failed to employ apprentices training in pipefitter-steamfitter work on the Projects involving pipefitter-steamfitter work processes, pipefitter-steamfitter apprentices have been denied training in skills crucial to securely building public works, and the Public Entities have suffered degradation of pipefitter-steamfitter apprenticeship programs in their geographic areas.

233.    Qui Tam Plaintiffs Haley, Rotz, and Long are informed and believe and thereupon allege that Defendant Balfour Beatty was awarded public-works projects it would not have been awarded absent the unfair competitive advantage it enjoyed by failing to comply with its public-works contracts and hiding that noncompliance from the Public Entities.

234.    Defendants' false claims are the basis for an award of treble damages and civil penalties under Government Code § 12651(a).  Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for three times the amount of damages that the Public Entity has sustained because of Defendants' acts and omissions, and for the costs of this civil action brought to recover all such damages.  Under Government Code § 12651(a)-(c), Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for a civil penalty of $10,000 for each false claim, statement or representation.  The amount in controversy is greater than $500 in value (*see* Government Code § 12651(d)).

**SECOND CAUSE OF ACTION**
**Causing False Records and Statements Material to False Claims to be Made or Used**
(Government Code § 12650 *et seq.*; § 12651(a)(2))

235.    Qui Tam Plaintiffs Haley, Rotz, and Long reallege and incorporate herein by reference the allegations contained in Paragraphs 1 through 226.

236.    In doing the acts described above, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment or approval, in violation of Government Code § 12651(a)(2) and related law.  In presenting claims for payment along with supporting records and other documents, Defendants impliedly certified that Balfour Beatty was employing and training apprentices in accordance with the applicable state-

approved apprenticeship standards as required by Labor Code § 1777.5(c). In doing so, Defendants have acted with actual knowledge, in deliberate ignorance, or in reckless disregard of the falsity of the information involved, presented, or caused to be presented.

237.    The Public Entities have been unaware of the falsity of Defendants' statements, claims, misrepresentations and omissions. In reliance on Defendants' statements, claims, misrepresentations and omissions, the Public Entities have paid Defendant Balfour Beatty many millions of dollars for the construction of their public-works projects.

238.    As a result of Defendants' records, statements, actions, claims, misrepresentations, omissions and implied certifications, each Public Entity has been severely injured and damaged.

239.    Defendants' false claims are the basis for an award of treble damages and civil penalties under Government Code § 12651(a). Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for three times the amount of damages that the Public Entity has sustained because of Defendants' acts and omissions, and for the costs of this civil action brought to recover all such damages. Under Government Code § 12651(a)-(c), Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for a civil penalty of $10,000 for each false claim, statement or representation. The amount in controversy is greater than $500 in value (*see* Government Code § 12651(d)).

## THIRD CAUSE OF ACTION
### Presentation of False Claims
(Government Code § 12650 *et seq.*; § 12651(a)(1))

240.    Qui Tam Plaintiffs Haley, Rotz, and Long reallege and incorporate herein by reference the allegations contained in Paragraphs 1 through 226.

241.    By doing the acts described above, Defendants have presented or caused to be presented false or fraudulent claims for payment or approval to each Public Entity, or to an officer or employee of each Public Entity, in violation of Government Code § 12651(a)(1) and related law. The claims were false or fraudulent because they impliedly certified that Balfour Beatty was employing and training Laborer apprentices in a ratio of at least one apprentice hour to every five

1   journeyman hours as required by Labor Code § 1777.5(g) *et seq.*

2   242.   In presenting these false claims, Defendants have acted with actual knowledge, in

3   deliberate ignorance, or in reckless disregard of the falsity of the information involved, presented,

4   or caused to be presented.

5   243.   The Public Entities have been unaware of the falsity of Defendants' statements,

6   claims, misrepresentations and omissions.  In reliance on Defendants' claims, misrepresentations

7   and omissions, the Public Entities have paid Balfour Beatty many millions of dollars for the

8   construction of their public-works projects.

9   244.   As a result of Defendants' actions, claims, misrepresentations, omissions and implied

10  certifications described above, each Public Entity has been and continues to be severely injured and

11  damaged.  Where Balfour Beatty failed to employ enough apprentices to meet minimum legal

12  apprenticeship requirements for the Laborer trade, Laborer apprentices have been denied training

13  and employment opportunities and the Public Entities have suffered degradation in the training of

14  construction craft workers in their geographic areas.

15  245.   Qui Tam Plaintiffs Haley, Rotz, and Long are informed and believe and thereupon

16  allege that Defendant Balfour Beatty was awarded public-works projects it would not have been

17  awarded absent the unfair competitive advantage it enjoyed by failing to comply with its public-

18  works contracts and hiding that noncompliance from the Public Entities.

19  246.   Defendants' false claims are the basis for an award of treble damages and civil

20  penalties under Government Code § 12651(a).  Defendants are liable to each Public Entity, and to

21  Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for three

22  times the amount of damages that the Public Entity has sustained because of Defendants' acts and

23  omissions, and for the costs of this civil action brought to recover all such damages.  Under

24  Government Code § 12651(a)-(c), Defendants are liable to each Public Entity, and to Qui Tam

25  Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for a civil penalty of

26  $10,000 for each false claim, statement or representation.  The amount in controversy is greater

27  than $500 in value (*see* Government Code § 12651(d)).

28  //

36

# FOURTH CAUSE OF ACTION
## Causing False Records and Statements Material to False Claims to be Made or Used
### (Government Code § 12650 *et seq.*; § 12651(a)(2))

247.    Qui Tam Plaintiffs Haley, Rotz, and Long reallege and incorporate herein by reference the allegations contained in Paragraphs 1 through 226.

248.    In doing the acts described above, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment or approval, in violation of Government Code § 12651(a)(2) and related law.  In presenting claims for payment along with supporting records and other documents, Defendants impliedly certified that Balfour Beatty was employing and training Laborer apprentices in sufficient numbers as required by Labor Code § 1777.5(g) *et seq.*  In doing so, Defendants have acted with actual knowledge, in deliberate ignorance, or in reckless disregard of the falsity of the information involved, presented, or caused to be presented.

249.    The Public Entities have been unaware of the falsity of Defendants' statements, claims, misrepresentations and omissions.  In reliance on Defendants' statements, claims, misrepresentations and omissions, the Public Entities have paid Defendant Balfour Beatty many millions of dollars for the construction of their public-works projects.

250.    As a result of Defendants' records, statements, actions, claims, misrepresentations, omissions and implied certifications, each Public Entity has been severely injured and damaged.

251.    Defendants' false claims are the basis for an award of treble damages and civil penalties under Government Code § 12651(a).  Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for three times the amount of damages that the Public Entity has sustained because of Defendants' acts and omissions, and for the costs of this civil action brought to recover all such damages.  Under Government Code § 12651(a)-(c), Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for a civil penalty of $10,000 for each false claim, statement or representation.  The amount in controversy is greater than $500 in value (*see* Government Code § 12651(d)).

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIFTH CAUSE OF ACTION
### Failure to Disclose False Claims
(Government Code § 12650 *et seq.*; § 12651(a)(8))

252.    Qui Tam Plaintiffs Haley, Rotz, and Long reallege and incorporate herein by reference the allegations contained in Paragraphs 1 through 226.

253.    Qui Tam Plaintiffs Haley, Rotz, and Long are informed and believe and thereupon allege that Defendants at some point discovered the falsity of their false claims, records or statements, or some of them, after they were submitted to the Public Entities or were made available for viewing by the Public Entities.  Qui Tam Plaintiffs Haley, Rotz, and Long are further informed and believe and thereupon allege that Defendants have failed within a reasonable time of discovery to disclose the false claims, or its discovery of them, to the Public Entities responsible for paying Defendant Balfour Beatty, in violation of Government Code § 12651(a)(8).  To the extent that Defendants were not aware of Balfour Beatty's violations of Labor Code 1777.5(g) *et seq*. at a time when they made certain claims during ongoing work on the public-works projects, Defendants later discovered, or but for deliberate ignorance or reckless disregard would have discovered, such violations as the projects continued.

254.    The Public Entities have been unaware of the falsity of Defendants' statements, claims, misrepresentations and omissions.  In reliance on Defendants' claims, misrepresentations and omissions, the Public Entities have paid and continue to pay Defendant Balfour Beatty many millions of dollars for the construction of their public-works projects.

255.    As a result of Defendants' failure to disclose the fact that their records, statements, actions, claims, misrepresentations, omissions and implied certifications set forth above were false, each Public Entity has been, and continues to be, severely injured and damaged.

256.    Defendants' false claims are the basis for an award of treble damages and civil penalties under Government Code § 12651(a).  Defendants are liable to each Public Entity, and to Qui Tam Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for three times the amount of damages that the Public Entity has sustained because of Defendants' acts and omissions, and for the costs of this civil action brought to recover all such damages.  Under Government Code § 12651(a)-(c), Defendants are liable to each Public Entity, and to Qui Tam

38

Plaintiffs Haley, Rotz, and Long acting as *qui tam* relators on behalf thereof, for a civil penalty of $10,000 for each false claim, statement or representation. The amount in controversy is greater than $500 in value (*see* Government Code § 12651(d)).

## PRAYER FOR RELIEF

WHEREFORE, with respect to each and every cause of action, Qui Tam Plaintiffs Haley, Rotz, and Long pray for the following relief:

1.     Assessment of treble damages against Defendants in the amount of three times the damages that the Public Entities have sustained because of Defendants' conduct.

2.     Judgment imposing on the Defendants a civil penalty of $10,000 for each violation of California Government Code § 12651—*i.e.*, for each false claim, including but not limited to any false, falsified, or fraudulent invoice, change order, report, bid document, claim, demand for payment, or any other false, falsified, or fraudulent action, record, statement, misrepresentation, or omission—to be assessed against Defendants in favor of Qui Tam Plaintiffs Haley, Rotz, and Long and the relevant Public Entity.

3.     Public Entities' costs and expenses related to this action.

4.     Qui Tam Plaintiffs Haley, Rotz, and Long's costs of suit and expenses.

5.     Qui Tam Plaintiffs Haley, Rotz, and Long's attorney's fees.

6.     Damages in the form of unpaid contributions to the California Apprenticeship Council, to Public Entities, and to apprenticeship-training programs.

7.     Such other and further relief as the Court deems just and proper.

Dated: January 21, 2014                              DAVIS, COWELL & BOWE, LLP

                                                     By ___*/s/ John J. Davis, Jr.*___
                                                        JOHN J. DAVIS, JR.
                                                        ERIC B. MYERS
                                                        DAVID L. BARBER

                                                     Attorneys for Qui Tam Plaintiffs
                                                     Bill Haley, Harry Rotz, and Lew Long

39